IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JOHN WILSON, JOHN ARNOLD, JAMES BRENT ENSEY, EDGAR KELLEHER, BRIAN LOGAN, TERRY S. MARTIN, ROBERT ROBERTSON, JACOB WILSON, JOHN CRAFT, DANIEL JOHNSON, JASON DILLARD, and RONALD ATTERBURY, | § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 1:17-CV-453-ADA |
| BRENT STROMAN, MANUEL CHAVEZ, ABELINO "ABEL" REYNA, CITY OF WACO, TEXAS, ROBERT LANNING, JEFFREY ROGERS, PATRICK SWANTON, STEVEN SCHWARTZ, and CHRISTOPHER FROST, | § § § § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs John Wilson, John Arnold, James Brent Ensey, Edgar Kelleher, Brian Logan, Terry S. Martin, Robert Robertson, Jacob Wilson, John Craft, Daniel Johnson, Jason Dillard, and Ronald Atterbury, (hereinafter "Plaintiffs") file this, their First Amended Complaint, and in support, respectfully show the Court as follows:

# I.  INTRODUCTION

1.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 arising from the unlawful arrests that occurred in Waco, Texas on May 17, 2015. The mass arrests were unprecedented in both their scope and the complete absence of individual, particularized facts to establish probable cause. Plaintiffs are seeking damages against Defendants Brent Stroman, Manuel Chavez, Abelino "Abel" Reyna, Robert Lanning, Jeffrey Rogers, Patrick Swanton, Steven Schwartz, and Christopher Frost in their individual capacities, for committing acts under color of law, which deprived Plaintiffs, as well as many other persons, of rights secured under the Constitution and Laws of the United States. Plaintiffs are also seeking damages against the City of Waco, Texas and McLennan County, Texas for similar constitutional violations.

2.     177 individuals were arrested on May 17, 2015 for the identical charges of Engaging in Organized Criminal Activity—by committing or conspiring to commit murder, capital murder, and/or aggravated assault as a member of a criminal street gang. This was done using a fill-in-the-name probable cause affidavit for each accused. Fifteen more were arrested for the same charge in subsequent months. These 192 people were arrested despite the fact that video evidence shows that the vast majority of those arrested, including Plaintiffs, immediately ran *away from the altercation* and towards cover when the fighting began. Furthermore, law enforcement possessed **no evidence** at the time—nor did they acquire any in the years that followed—that the vast majority of those arrested, including Plaintiffs, belonged to criminal street gangs.

3.	Nonetheless, law enforcement arrested scores of innocent people based on nothing more than mere presence at the scene of a crime and a purely fictitious conspiracy theory. Doubling down on the absurdity of the situation, bond was set for each and every one of them at a staggering $1,000,000.

4.	Nearly four years later, only one — *one* — of the 192 arrested has gone to trial. Many were never even presented to a grand jury, but were not officially cleared for almost three years after the event.  To date, 168 of the 192 have been dismissed. The newly elected district attorney has expressed publicly that further dismissals are likely.

5.	McLennan County Judge Ralph Strother has said he was "troubled by the whole Twin Peaks matter from its inception," and "very happy to sign the dismissals" of 42 criminal defendants in May 2018. A special prosecutor assigned to one defendant's case said,

> I don't think the case should have been filed in the first place based on all the facts and evidence that I saw. . . . In my opinion, that just wasn't a sufficient basis to charge someone without any evidence that they were involved in any wrongdoing that day. . . . There was just no evidence to show he was involved with anything that happened there, other than being present, and that ain't enough.

That man's story is nearly identical to those of the great majority of motorcyclists who were arrested that day, including Plaintiffs.

6.	Although the damage to Plaintiffs and the United States Constitution can never be undone, an award under § 1983 would achieve some measure of compensation for the injustice perpetrated by Defendants in this case.

## II. PARTIES

7.     Plaintiff John Wilson is a resident of McLennan County, Texas

8.     Plaintiff John Arnold is a resident of McLennan County, Texas.

9.     Plaintiff James Brent Ensey is a resident of Stephens County, Texas.

10.    Plaintiff Edgar Kelleher is a resident of Palo Pinto County, Texas.

11.    Plaintiff Brian Logan is a resident of Maryland.

12.    Plaintiff Terry S. Martin is a resident of Lubbock County, Texas.

13.    Plaintiff Robert Robertson is a resident of Tarrant County, Texas.

14.    Plaintiff Jacob Wilson is a resident of McLennan County, Texas.

15.    Plaintiff John Craft is a resident of Bell County, Texas.

16.    Plaintiff Daniel Johnson is McLennan County, Texas.

17.    Plaintiff Jason Dillard is a resident of Smith County, Texas.

18.    Plaintiff Ronald Atterbury is a resident of Coryell County, Texas.

19.    Chief Brent Stroman ("the Chief" or "Stroman"), was the Chief of Police of the Waco Police Department at all relevant times and is sued in his individual capacity. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Stroman has been served and has filed an appearance herein.

20.    Det. Manuel Chavez ("Chavez"), is a police officer employed by the Waco Police Department. Chavez is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State

of Texas and/or the City of Waco, Texas. Defendant Chavez has been served and has filed an appearance herein.

21.     Abelino "Abel" Reyna ("Reyna"), was the elected District Attorney of McLennan County, Texas at all relevant times and is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Reyna has been served and has filed an appearance herein.

22.     Defendant City of Waco, Texas is a municipality existing under the laws of the State of Texas, and has been served and has filed an appearance herein.

23.     Defendant McLennan County, Texas is a governmental unit existing under the laws of the State of Texas, and has been served and has filed an appearance herein.

24.     Robert Lanning ("Lanning"), is an Assistant Chief of Police and is employed by the Waco Police Department. Lanning is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State of Texas and/or the City of Waco, Texas. Defendant Lanning has been served and has filed an appearance herein.

25.     Det. Jeffrey Rogers ("Rogers"), is a police officer employed by the Waco Police Department. Rogers is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State of Texas and/or the City of Waco, Texas. Defendant Rogers has been served and has filed an appearance herein.

26.    Patrick Swanton ("Swanton"), is a police officer employed by the Waco Police Department. Swanton is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State of Texas and/or the City of Waco, Texas. Defendant Swanton has been served and has filed an appearance herein.

27.    Steven Schwartz (hereinafter "Schwartz") is a special agent employed by the Texas Department of Public Safety (hereinafter "DPS"). Schwartz is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State of Texas and/or the City of Waco, Texas. Defendant Schwartz has been served and has filed an appearance herein.

28.    Christopher Frost (hereinafter "Frost") is a special agent employed by the Texas Department of Public Safety. Frost is sued in his individual capacity. He acted under the color of law of the statues, ordinances, regulations, policies, customs, and usages of the State of Texas and/or the City of Waco, Texas. Defendant Frost has been served and has filed an appearance herein.

### III. <u>JURISDICTION</u>

29.    This action is brought pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C § 1331, as this lawsuit arises under the Constitution, laws, or treaties of the United States.

## IV. <u>VENUE</u>

30.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## V. <u>FACTUAL BACKGROUND</u>

<u>OVERVIEW</u>

31.     On May 17, 2015, hundreds of motorcycle enthusiasts from across the state gathered in Waco, Texas for a scheduled Texas Confederation of Clubs & Independents ("COC") meeting. As with any COC meeting, bikers expected to hear from speakers on topics ranging from state legislative updates to national motorcycle safety initiatives. The Waco COC meeting was also expected to be as much a social gathering as it was informative.

32.     Because certain members of law enforcement had become aware of friction between some members of the Bandidos Motorcycle Club ("Bandidos") and some members of the Cossacks Motorcycle Club ("Cossacks"), undercover and uniformed officers were located around the perimeters of the Twin Peaks restaurant where the COC meeting was occurring.

33.     It has been admitted by law enforcement that they were present in an intelligence-gathering capacity and had no evidence of planned violence.

34.     Tragically, violence erupted and nine lives were lost, with others sustaining non-fatal injuries. It is undisputed that a number of the casualties were a direct result of deadly use of force by law enforcement.

35.     Regardless of the manner or cause of the deaths, the loss of life that occurred that day is, without question, tragic. Unfortunately, the actions of law enforcement, including members of the McLennan County District Attorney's Office, compounded the tragedy by causing the wrongful arrest and incarceration of countless innocent individuals.

36.     The video evidence confirms that the vast majority of attendees did not participate in any violence that day.

37.     This majority of non-violent attendees was ultimately arrested en masse despite Defendants' awareness that:

38.     No evidence existed that these individuals participated in the violence;

39.     No evidence existed that these individuals came to the COC meeting with any intention to commit violence; and

40.     Notwithstanding law enforcement's claim that Plaintiffs' mere presence at Twin Peaks was somehow illegal, no evidence existed that these individuals committed any crimes at all.

41.     Despite a total lack of particularized evidence relating to specific individuals, Defendants Stroman, Chavez, Reyna, Lanning, Rogers, Swanton, Schwartz, and Frost caused Plaintiffs and others who were not involved in the violence to be arrested and charged with Engaging in Organized Criminal Activity based entirely on their presence at Twin Peaks and a pre-determined criteria that essentially asked investigators to use the motorcyclists' clothing and personal effects such as keychains and

bumper stickers to determine their membership in or even the loosest alleged affiliation with the Bandidos or Cossacks.

42. Rather than investigating the incident and relying on actual facts to establish probable cause, Defendants fabricated a conspiracy of epic proportion between dozens of people, and willfully ignored the total absence of facts to support such fantastical allegations.

43. In the absence of particularized evidence to establish probable cause against Plaintiffs, the individual Defendants caused an affidavit to be issued and sworn to by Defendant Chavez that contained material misrepresentations. Specifically, the affidavit alleges that Plaintiffs were members of a criminal street gang, that they regularly associate in the commission of criminal activities, and that they conspired to commit murder, capital murder, or aggravated assault.

44. Plaintiffs categorically deny the truthfulness or accuracy of these statements.

45. As more fully set forth below, Plaintiffs are neither members of a criminal street gang, nor do they regularly associate in the commission of criminal activities. Perhaps most notably, the affidavit sets forth no particularized facts of anything resembling a common plot to commit these crimes.

46. The individual Defendants' conduct of alleging these "facts" against Plaintiffs when they, in fact, had no such evidence can only be construed as willful, intentional, and/or reckless.

## SPECIFIC FACTUAL ALLEGATIONS

47.     The COC is a non-profit organization of motorcyclists with a mission to lobby for motorcyclist rights and safety legislation in the State of Texas.

48.     COC meetings are not held in any one specific city and are open to all motorcyclists.

49.     The May 17, 2015 COC meeting in Waco had been scheduled several weeks in advance and was posted publicly on the COC website prior to the date of the event. Bikers from numerous motorcycle clubs from all over the state were expected to attend.

50.     Numerous motorcycle clubs were represented at the May 17th COC gathering. No law of the State of Texas or the United States prohibits an individual's right to associate with a motorcycle club. In fact, an individual's right to associate is guaranteed by the First Amendment to the United States Constitution.

## THE INCIDENT

51.     At approximately noon on May 17, 2015—before the event was scheduled to start—an altercation occurred in the parking lot near the front entrance of Twin Peaks between several individuals. Within moments, the situation escalated and shots were fired. At its conclusion, nine individuals were dead and at least twenty were injured. Autopsy and ballistics reports indicate that at least four of the deaths were the direct result of shots fired by law enforcement.

52.     As the gunfire erupted, video evidence conclusively proves that the vast majority of the individuals present at the location—including Plaintiffs—did not

participate in any violent activity, but instead ran away from the gunfire or ducked for cover.

53.     Many of those ultimately arrested were never anywhere near the part of the property where the altercation occurred, and some had only just pulled up into the parking lot when it began.

54.     Once the shooting ceased, law enforcement officers immediately took control of the premises. The individuals present were compliant and did not resist commands of law enforcement.

**INVESTIGATION**

55.     Defendant Chavez is a detective in the Special Crimes Unit of the WPD. On May 17, 2015, he was the on-call investigator and as a result, was called to the scene as the lead investigator of the Twin Peaks incident.

56.     Defendant Rogers is a WPD gang detective. On or about May 17, 2015, Defendant Rogers, along with DPS agents Schwartz and Frost provided false and misleading information regarding Plaintiffs alleged affiliation with criminal street gangs, which ultimately was a primary factor in causing their false arrest.

57.     On or about May 17, 2015, Defendant Swanton, a WPD officer, also provided false and misleading information during numerous press conferences to the public regarding Plaintiffs' alleged affiliation with criminal street gangs, notwithstanding the absence of any evidence supporting his statements.

58.     Defendant Reyna, the elected McLennan County District Attorney, and First Assistant District Attorney Michael Jarrett were on scene after the incident

investigating the shooting, along with law enforcement officials from numerous local and state agencies. Defendant Reyna has publicly acknowledged that he took the unusual step of assisting law enforcement officials and was involved in the actual investigation of the incident.

59.     After several hours, all individuals in attendance at the COC meeting were transported to the Waco Convention Center for interviews. For the remainder of the day, WPD detectives, Texas Rangers, and DPS special agents conducted interviews of those in attendance.

60.     Initially, the detained motorcyclists were being interviewed as witnesses and not being read *Miranda*[1] warnings—since they were not under arrest—unless WPD was aware of outstanding warrants or had probable cause to believe they were directly involved in the altercation.

61.     Throughout the interviews, a common theme became evident: the detained individuals were merely present for a meeting, to visit with friends, eat food, and enjoy socializing with other motorcycle enthusiasts. During the interviews, it was learned that most were nowhere near the shooting; many had just arrived at the restaurant, and none were aware of a prearranged plan of violence.

62.     It was also learned that the vast majority of the individuals immediately took cover at the outset of the gunfire, and did not in any way participate in or encourage the violence. Video evidence in the possession of law enforcement, and reviewed within

---

[1]   *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

hours of the incident, clearly demonstrates that the vast majority of those present, including Plaintiffs, appeared surprised and confused upon hearing the initial gunfire.

63.     Further, it clearly shows the vast majority of those present, including Plaintiffs, running away from the disturbance, not toward it. The video evidence clearly and unambiguously proves the complete lack of involvement in the disturbance of the vast majority present, including Plaintiffs.

64.     Defendants Stroman, Chavez, Reyna, Lanning, Rogers, Swanton, Schwartz, and Frost possessed no evidence that these individuals, including Plaintiffs, participated in the violence that day. That Defendants possessed no evidence of this kind cannot seriously be disputed.

65.     Investigators, many of whom were from the Austin division of DPS, were providing the information learned during interviews directly to Defendant Reyna, Defendant Lanning (who was the acting Chief of Police at the time of the incident), and Defendant Chavez, among others. As such, members of law enforcement responsible for the decision to arrest Plaintiffs were fully aware of their complete lack of any connection to the violence that occurred, based on the evidence gained from the interviews.

66.     Any reasonable reading of documents related to this incident clearly demonstrates that law enforcement officers, including Defendants Lanning, Chavez, Schwartz, Swanton, Rogers and Frost, did NOT believe probable cause existed to arrest those not directly involved with the violence, including Plaintiffs.

67.     Not only was a conscious decision made not to Mirandize those being interviewed (since they were not suspects), but documents related to this incident clearly

establish that a very specific plan for the release of most individuals, including Plaintiffs, was in the works just prior to the decision to arrest everyone and charge each person with the first degree felony of Engaging in Organized Criminal Activity by committing or conspiring to commit murder, capital murder, or aggravated assault.

68.     In fact, by the time the decision to arrest everyone was made, several dozen motorcyclists had already been released. In court testimony, law enforcement has been unable to articulate a legally substantive reason why those motorcyclists were released while others in nearly identical circumstances were arrested.

**DEFENDANTS' DECISION TO ARREST**

69.     From the outset, Reyna was fishing for reasons to arrest everyone under a mass conspiracy theory.

70.     Reyna was alone in his belief that probable cause existed to justify a mass arrest, including the arrest of Plaintiffs.

71.     At some point, after numerous motorcyclists had already been released, Defendant Reyna told Defendant Lanning that "all bikers wearing colors" should be arrested.[2]

72.     Lanning consulted with the two other assistant chiefs and Sgt. V.R. Price regarding Reyna's desire to arrest everyone. Based on what they knew from the interviews and what they had observed at the scene, all four disagreed with Reyna's

_____

[2] This was later slightly refined to bikers who were Cossacks, Bandidos, or "could be shown to be their affiliates." Nonetheless, motorcyclists wearing colors unassociated with either club were in fact arrested anyway.

recommendation that everyone should be arrested. Lanning's testimony in a Motion to Disqualify from August 8, 2016 is clear:

> A.    His recommendation was that they should be charged.
>
> Q.    Okay.
>
> A.    If they were wearing colors or -- if they were either the Bandidos, Cossacks, or an affiliate support club.
>
> Q.    And based on -- based on him recommending that these bikers should be arrested, what took place?
>
> A.    I originally consulted with the other two assistant chiefs and Sergeant Price to get their opinion.
>
> Q.    And what was their opinion?
>
> A.    They did not agree with the decision to arrest them.
>
> Q.    Any law enforcement official agree with the decision to arrest them?
>
> A.    I don't know.
>
> Q.    Well, let's talk about you.  Did you agree with the decision?
>
> A.    Not in my position as acting chief.

73.    When Lanning communicated this to Reyna, Reyna was unsatisfied with Lanning's decision and told him to call Chief Stroman, who was on vacation on the east coast.

74.     Ultimately, Reyna informed Stroman that he thought there was sufficient probable cause to arrest any biker who was present and appeared by virtue of clothing or personal effects to be affiliated with the Bandidos or Cossacks. Based on Reyna's representation alone and no specific facts linking each individual motorcyclist to any criminal activity, Stroman decided to approve Reyna's plan to arrest everyone.

75.     Defendant Chavez ordered all of the investigators to stop their interviews at approximately 8:30 p.m. because Defendant Reyna had called a meeting. From approximately 9:00 p.m. to 10:30 p.m., Reyna met with members of WPD and Texas DPS regarding the incident. Soon thereafter, investigators were informed that Reyna, Lanning, and/or Stroman had agreed to arrest all motorcyclists that met certain criteria, and to charge each with the offense of Engaging in Organized Criminal Activity.

76.     The "criteria," which represented the entire factual determination of probable cause, was decided completely by the DA's office and given to all detectives to follow in compiling the list of individuals to be arrested.[3]

77.     Documents related to the mass arrests prove that the individual Defendants arrested Plaintiffs based on motorcycle club association and/or clothing, patches, key chains, etc. that allegedly reflected "support" for either the Bandidos or the Cossacks in the altercation that occurred that day.  In fact, much of the clothing, patches, key chains, etc. that Defendants claim signifies "gang membership" was, and remains,

---

[3] Testimony of Sgt. V.R. Price, Motion to Disqualify, August 8, 2016, page 31:
Q: Okay. So they—the District Attorney's office set the criteria and law enforcement applied the criteria, that's—
A: That's correct.

available for public purchase over the internet, at motorcycle gatherings, and in some retail stores throughout Texas.

78.     Defendant Stroman has publicly acknowledged in press conferences and testimony his responsibility in the decision to arrest the 177, including Plaintiffs, as described more fully below.

79.     Documents related to the incident and testimony of numerous law enforcement witnesses (including Reyna himself) clearly establish that Defendant Reyna injected himself into the investigation and was primarily responsible for the determination that probable cause existed to arrest the 177—including Plaintiffs—based on nothing more than presence and affiliation with particular motorcycle clubs.

80.     Defendants Lanning, Chavez, Swanton, Schwartz, Rogers, and Frost unlawfully acquiesced to what each knew was a mass arrest, including the arrest of Plaintiffs, unsupported by probable cause.

81.     Lanning admitted that he kept the city manager and "anybody else legal that needed to be aware" apprised of the developments that day.

82.     Despite possessing video from numerous angles showing the complete lack of involvement of most of those arrested, and hours and hours of interviews with the arrested individuals in which no evidence of a conspiracy was uncovered to support their "theory" of pre-planned violence, Defendants willfully, intentionally, and recklessly charged 177 individuals, including Plaintiffs, with the identical first degree felony of Engaging in Organized Criminal Activity by committing or conspiring to commit murder, capital murder, or aggravated assault.

83.     To clarify, the decision to arrest and charge Plaintiffs and the other individuals with crimes despite video evidence, and statements from hundreds of witnesses that directly contradict the existence of probable cause, or any reasonable belief thereof, can only be characterized as willful, intentional, and/or reckless. Based on the very specific information known by Defendants at the time the decision was made to arrest, including CLEAR and UNAMBIGUOUS video evidence directly at odds with Defendants' theory of a mass criminal enterprise engaging in organized crime, it is impossible to believe Defendants' conduct and decisions were anything other than willful, intentional, and/or reckless. Defendants' decision to ignore contrary and exculpatory evidence in favor of a theory unsupported by the facts or the law was consciously made and therefore willful, intentional, and/or reckless. Investigative reports and DPS witness summaries provide specific proof of the facts alleged herein.

84.     Again, it is an indisputable fact that law enforcement possessed no evidence that Plaintiffs were involved in any way with the altercation, and no evidence that they had any intention—let alone a pre-conceived common plan—to commit, support, or encourage any violent acts that day.

## THE AFFIDAVIT TO OBTAIN AN ARREST WARRANT

85.     On or about May 18, 2015, or May 19, 2015, Defendants caused a general warrant—long known to be repugnant to the Fourth Amendment—to be used for the purpose of obtaining arrest warrants for each of the 177 individuals, including Plaintiffs.[4]

---

[4] "'[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized*.'

86.     Despite the United States Constitution requiring a ***particularized*** showing of facts against an individual before a warrant can issue, an identical fill-in-the-name affidavit (hereinafter "affidavit" or "probable cause affidavit," attached as Exhibit 1) was used as the basis for establishing probable cause for each of the arrested individuals.

87.     It is indisputable that the affidavit in question **does not set forth particularized facts against Plaintiffs** that would in any way establish probable cause. Assuming *arguendo* that the probable cause affidavit contains specific allegations of fact against each Plaintiff, each such allegation is false and untrue. Accordingly, the probable cause affidavit is completely false and misleading in material ways as it relates to these Plaintiffs.

88.     The affidavit against each Plaintiff fails to set forth any specific facts that, if believed, would constitute probable cause.  Even if the claim that each Plaintiff is "a member of a criminal street gang" was true, <u>and it is not</u>, the affidavits lack any factual assertions specific to each Plaintiff upon which a finding of probable cause could be based. Namely, it fails to assert any facts showing that Plaintiffs committed or conspired to commit any of the crimes enumerated in § 71.02, or any other specific violations, for that matter.

---

"These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.'" *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

89.     Defendant Chavez has acknowledged that he read the template affidavit and inserted names of individuals based on a list he was provided. Chavez has testified in examining trials that he did not, in fact, possess personal knowledge of all the assertions made in the affidavit. He has further testified to a lack of knowledge concerning individual arrestees' involvement in the incident.

90.     Defendant Chavez did not question the template affidavit or the basis of the criminal charge despite the fact that he had already begun the process of overseeing arrangements to release all of the detainees.

91.     Furthermore, he had no input into what was set forth in the affidavit and made no changes to it before signing it. Even worse, he signed off on an affidavit *that he himself did not even understand*. As he later testified, any justification for the arrests (in other words, probable cause) would have to be explained by the DA's office.

92.     Defendant Chavez swore to 177 template affidavits *en masse* – that is, he swore under oath that the stack before him was true and correct – and is the sole affiant for all affidavits.

93.     Chavez swore under oath he had personal knowledge of the information contained therein, even though he did not. Having read the affidavit, Defendant Chavez knew he did not have personal knowledge as to the particular facts of each individual, including Plaintiffs.

94.     Chavez knew that the affidavit was open-ended, false, and misleading in a material manner, yet he presented it to Magistrate Peterson for the purpose of obtaining arrest warrants, including Plaintiffs.

95. In an attempt to deflect responsibility for his decision to order the mass arrests, including the arrests of Plaintiffs, Defendant Reyna claimed under oath that he specifically recalled personally instructing Chavez to confirm the accuracy and truthfulness of the statements made in the probable cause affidavit before presenting it to the magistrate.

96. However, Chavez has testified that he didn't even speak to Reyna prior to swearing to the affidavit.

97. The template affidavit, sworn to by Defendant Chavez, is wholly lacking in probable cause, and instead is filled with conclusory, inaccurate statements and/or background facts. Plain and simple, the affidavit does not indicate any particular facts that Plaintiffs were even aware of tension that might have existed between certain individuals that were present at Twin Peaks. The affidavit does not assert how, when, where, or with whom Plaintiffs conspired or to any facts that could be construed as a decision by Plaintiffs to engage in a conspiracy. The affidavit is devoid of any facts describing any criminal activity in which Plaintiffs were believed to be involved.

98. The affidavit falsely states that each Plaintiff is "a member of a criminal street gang." That statement is categorically *false*.

99. It is an indisputable fact that Defendants did not possess any reliable, particularized information to indicate that Plaintiffs themselves were members of a criminal street gang on or before the date such fact was sworn to by Defendant Chavez.

100. Plaintiffs were not, and have never been in a gang of any type, much less a "criminal street gang." Membership in a motorcycle club does not constitute "gang

membership," no matter how many times Defendants Reyna and Swanton suggest otherwise on television.

101.    Plaintiffs are law-abiding citizens who associate with other law-abiding citizens and in no way, shape, or form are members of a "criminal street gang."

102.    At the time of the incident, the motorcycle club(s) that Plaintiffs belonged to were not included on any law enforcement lists as a "criminal street gang."

103.    Finally, no law enforcement list or database showed any of these Plaintiffs to be a "member of a criminal street gang" at the time of the incident or on the date on which Defendant Chavez swore to those facts for the purpose of establishing probable cause.

104.    Furthermore, the affidavits falsely imply that ALL "members and associates" of the Bandidos or Cossacks "engaged in an altercation" and "brandished and used firearms, knives, or . . . other weapons."  In fact, Plaintiffs did not engage in such activity, and law enforcement had no evidence that they had.

105.    Moreover, law enforcement knew very well that only a small minority of the motorcyclists present had actually participated in the violence, so this was a blatant misrepresentation to the magistrate.

106.    The affidavits contain *no particularized facts* to support an allegation that any Plaintiff herein was directly involved in the violence that occurred.

107.    Notwithstanding any of the above, Defendants Rogers, Swanton, Schwartz, and Frost made material misrepresentations that Plaintiffs were members or associates

of a known criminal street gang, which they knew would be relied upon in forming a basis for probable cause to arrest Plaintiffs.

108.    By indicating that Plaintiffs were members of criminal street gangs, when in fact they were not, and when there was no such evidence of gang membership, the individual Defendants caused a warrant to be issued that would otherwise have lacked any factual basis for probable cause.

109.    Defendants Chavez, Lanning and Reyna all knew the exact wording of the probable cause affidavit and knew at the time it was sworn to and presented to the magistrate for a determination of probable cause that it contained false statements.

110.    They knew the affidavit contained false and misleading statements because they were involved in every aspect of the investigation from the beginning, and knew or should have known that Plaintiffs were not members of a criminal street gang because no evidence existed that made such an assertion, and neither Plaintiffs nor their respective motorcycle clubs were identified on any law enforcement database at the time of the incident in question as being in a criminal street gang, or members of a criminal street gang.

111.    On the date that Plaintiffs were arrested and falsely charged, Defendants Chavez, Stroman, Reyna, Lanning, Rogers, Swanton, Schwartz, and Frost all were privy to DPS gang databases and knew or should have known that none identified Plaintiffs as members of a criminal street gang.

112.    Nonetheless, each Defendant allowed the false statement to become a central basis for the arrests and detention of Plaintiffs.

113.     Further, the individual Defendants all knew, or should have known, that Plaintiffs were not engaging in criminal conduct at Twin Peaks since the video evidence in their possession CLEARLY and UNAMBIGUOUSLY proves that Plaintiffs did not participate in, nor did they encourage, the disturbance that escalated into violence.  In fact, the video evidence **proves** that Plaintiffs were **not** involved, yet the individual Defendants willfully ignored the video evidence and caused Plaintiffs' constitutional rights to be violated.

114.     Each individual Defendant was certainly aware that neither he, nor any other law enforcement officer, possessed knowledge that Plaintiffs regularly associated in the commission of criminal activities.

115.     In the aftermath of the incident at Twin Peaks, Defendants apparently concluded that the Bill of Rights to the U.S. Constitution ceased to apply and could be ignored, given what they perceived as an immediate need to announce the re-establishment of law and order in their town.

116.     Compounding Defendants' gross violations of civil rights, an identical one million dollars ($1,000,000.00) bail was set for each of the 177 detained individuals, including Plaintiffs, despite the Eighth Amendment to the U. S. Constitution's clear mandate that "excessive bail shall not be required, nor excessive fines imposed..." Magistrate Peterson announced publicly that he was "sending a message" with the million-dollar bonds.

117.     As a result of all of the above, Plaintiffs were wrongfully incarcerated following their arrest.

## MISSTATEMENTS AND EXAGGERATIONS TO THE MEDIA

118.    Since the outset, law enforcement's narrative of the event as told to the public bears little resemblance to the actual facts.

119.    Within hours of the Twin Peaks incident, information was provided to the media that was inaccurate, exaggerated, and highly misleading. Defendant Stroman allowed WPD representatives, particularly Defendant Swanton, to set forth a narrative that was inaccurate in many respects. The "shootout between outlaw motorcycle gangs" theme that continues to be trumpeted is patently false. Defendant Swanton's perpetuation of the narrative has caused irreparable harm to the reputations of the many individuals, including Plaintiffs, who had nothing to do with the fatalities and injuries.

120.    WPD's intent to create a false picture of the event is most evident in the manner that guns and knives were displayed to the media following the incident. The majority of the knives confiscated would not be considered illegal under § 46.02 of the TEXAS PENAL CODE, and were voluntarily relinquished upon requests from law enforcement soon after the shootings. Notwithstanding an individual's right to carry a legal knife, the knives were displayed to the media with blades extended in an effort to appear as menacing as possible.

121.    A similar storyline emerged regarding the number of guns seized after the incident, which was grossly overstated in initial reports. Police representatives omitted the truth that many of these guns were found outside the restaurant following the incident, stored safely on motorcycles or in other vehicles, as permitted by Texas law.

122. Perhaps the most misleading characterization of the events was made days after the incident by Defendant Reyna when he implied that those arrested were guilty because "if they're victims, then they shouldn't have *any* problem coming to law enforcement and cooperating... and, at least in the first round of interviews, we ain't getting that." This is blatantly false.

123. A review of investigators' records documenting the interviews that were conducted with the detained bikers clearly establishes that the vast majority, including Plaintiffs, were completely cooperative during interviews, and voluntarily submitted to questioning and requests for forensics (volunteering DNA samples and gunshot residue testing) from law enforcement. Defendant Reyna knew of these facts at the time he made the above described public statement.

124. Almost three years after the incident, Defendant Reyna publicly asserted during his re-election campaign that every person arrested at Twin Peaks was a member of a criminal street gang and involved in criminal activity. Reyna made these statements knowing full well that Plaintiffs were not members of a criminal street gang, nor did he possess any evidence that in any manner connected them to criminal activity.

**THE INDICTMENT**

125. On November 10, 2015 and March 23, 2016, a McLennan County Grand Jury indicted a total of 154 individuals, including Plaintiffs, for the exact same crime of Engaging in Organized Criminal Activity with the Intent to Commit or Conspire to Commit Murder, Capital Murder, or Aggravated Assault. The indictments, like the probable cause affidavit, are identical for every single individual. To date, there has been

no attempt to state with any particularity the facts on which the first-degree felony charges against Plaintiffs are based. From a fill-in-the-name template probable cause affidavit, to a fill-in-the-name template Indictment, violations of Plaintiffs' constitutional rights continue.

## GRAND JURY DELIBERATIONS WERE TAINTED

126. The Grand Jury's deliberations that resulted in Plaintiffs' True Bills of Indictment were tainted by the use of wholly inaccurate, false, and woefully incomplete information.

127. Plaintiffs' counsel has requested from Defendants a transcript of the Grand Jury proceedings.

128. According to counsel for Defendant Reyna, no transcript of the proceeding exists, nor were the proceedings recorded such that a transcript could be created.

129. Despite the "secrecy" of the Grand Jury deliberations, numerous factual inferences can be drawn that demonstrate that the Grand Jury deliberations were tainted. They are as follows:

130. The Grand Jury was misled by the presentment of materially misleading and false statements claiming Plaintiffs to have been members of criminal street gangs at the time of the Twin Peaks incident, when in fact, they were not. Membership in a criminal gang is an essential element of the organized crime charge with which Plaintiffs were indicted.

131. Defendants have admitted repeatedly in sworn testimony that they had no knowledge or evidence of the motorcyclists' intentions. Combined with the fact that

Plaintiffs are NOT members of a criminal gang, only inaccurate, false, and/or incomplete evidence could have been submitted to the Grand Jury to support an allegation that they *specifically intended* to "participate as a member of a criminal gang."

132.    Further, clear and unambiguous video evidence that would have proven each Plaintiff's lack of involvement in the Twin Peaks violence was intentionally withheld from the Grand Jury.

133.    Video evidence shows Plaintiffs were either nowhere near the violence when it occurred, or immediately ducked for cover or ran away from the altercation. This evidence is directly exculpatory for the elements of "*participating* as a member of a criminal gang" and "committing or conspiring to commit" murder, capital murder, or aggravated assault. Upon information and belief, this critical evidence was <u>not</u> presented to the Grand Jury that indicted Plaintiffs herein. Defendants had this video evidence in their possession at the time they sought Plaintiffs' indictment from the Grand Jury.

134.    Upon information and belief, no non-law-enforcement eyewitnesses were presented to the Grand Jury. Countless eyewitnesses would have testified that they knew of no plan to commit violence and witnessed most of the motorcyclists—including Plaintiffs—actively avoid getting involved in the altercation after it started.

135.    Upon information and belief, Defendant Chavez testified before the Grand Jury.

136.    It is reasonable to believe that Defendant Chavez testified consistent with his sworn affidavit upon which the arrest warrants for Plaintiffs were issued. As outlined above, the probable cause affidavit contains false and materially misleading statements.

137.    Because there is no other evidence that in any way links these Plaintiffs to the violence that occurred at Twin Peaks on May 17, 2015, it is a reasonable inference that Defendant Chavez tainted the Grand Jury deliberations by repeating the same false statements contained in his probable cause affidavit.

138.    It is a reasonable inference that Defendant Chavez testified to the Grand Jury consistent with his probable cause affidavit because Chavez testified to those same "facts" during one or more examining trials involving individuals arrested at Twin Peaks on or about May 17, 2015.

139.    Despite admitting a lack of personal knowledge of certain key facts that were contained in his probable cause affidavit, Chavez testified at one or more examining trials related to the Twin Peaks arrests that all individuals wearing certain patches and clothing were members of criminal street gangs.

140.    These statements were false when made at the examining trials, and were also false when made to the Grand Jury.

141.    The indictments returned against each Plaintiff herein (and every other person against whom the DA has chosen to present a case) charge Plaintiffs with murder and assault, and includes the statement "And the Defendant did then and there commit the offense as a member of a criminal street gang." As discussed above, Plaintiffs were not, nor have they ever been, a member of a criminal street gang. This false and misleading evidence was originally sworn to by Defendant Chavez in his probable cause affidavit and was clearly repeated to the Grand Jury despite the total falsity of the statement.

142. There is simply no logical or plausible explanation for the inclusion of this false statement in the indictment returned by the Grand Jury except that the Grand Jury was misled by the use of false and inaccurate testimony. The Grand Jury could not make such an allegation in the absence of testimony to that effect. It is a reasonable inference that the Grand Jury was provided false information regarding membership in a criminal street gang since it is nearly verbatim the language contained in the probable cause affidavit. Further, it is almost identical to testimony that Chavez and/or Schwartz gave in one or more examining trials related to this incident.

143. Upon information and belief, Defendant Schwartz also testified before the Grand Jury. It is a reasonable inference that he too provided false and misleading evidence to the Grand Jury since, like Chavez, he had testified on the same subject at one or more examining trials related to the Twin Peaks mass arrests. In multiple examining trials, Schwartz testified that individuals were conspiring with those who committed the actual violence by their mere presence at the COC meeting. Despite admissions at examining trials that he possessed no knowledge of direct participation in the violence of many of those arrested, he repeatedly swore that criminal conduct occurred because individuals who were merely present at the location were there in a "show of force" to support the violence. This assertion was categorically false when testified to in examining trials, and there is no reason to believe Schwartz testified differently before the Grand Jury. It was false because the vast majority that he claimed were there as a "show of force" had no prior knowledge that an incident was likely to occur, and had specifically denied similar allegations during interviews with law enforcement.

144.     As noted previously, there is an abundance of CLEAR and UNAMBIGUOUS video evidence in this case, and it conclusively proves that Plaintiffs in no way, shape, or form participated in or encouraged the violence that occurred at Twin Peaks. In fact, Plaintiffs did the opposite.

145.     For several reasons, it is a reasonable inference that this key video evidence was withheld from the Grand Jury. First, the theory that hundreds of bikers came from all over the state of Texas in a show of force is unequivocally debunked by the video evidence. The vast majority of those present IMMEDIATELY took cover and hid behind vehicles upon the first shots being fired. The actions depicted on the video evidence directly contradicts the sole theory of culpability upon which Plaintiffs' false arrests are based. Had this evidence been shown to the Grand Jury, it is reasonable to believe that Plaintiffs would not have been indicted.

146.     Second, it is a reasonable inference that the video evidence was withheld from the Grand Jury because they simply did not have time to consider this important evidence. Public statements by Defendant Reyna and others make it clear that the Grand Jury met concerning the Twin Peaks arrests for the first time on November 10, 2015. On that same day, the Grand Jury issued 106 true bills, and based on public statements made by Reyna, the Grand Jury issued indictments on every case that was presented.[5] It is significant to note that on January 27, 2016 (more than eight months after the Twin Peaks

_____

[5] Since that day, the Grand Jury convened on March 23, 2016 for half a day and returned another 48 indictments. To date, the Grand Jury has returned indictments on 154 of the 154 cases that have been presented. No witnesses were called to testify during the Grand Jury deliberation of March 23, 2016. Nevertheless, the Grand Jury returned 48 indictments.

incident), District Attorney Reyna stated in a Motion for Continuance that the State would likely need another twelve months before it could sort through all the evidence and be ready for trial. Yet in a matter of a single work day, the Grand Jury was presented evidence and returned indictments against 106 separate individuals, all for the same crime—using identical fill-in-the-blank indictments, of course!

147.     The above description of the Grand Jury deliberations is necessary to dispel any notion that a "neutral intermediary" considered particularized evidence pertaining to each Plaintiff's arrest prior to issuing true bills of indictment. It is a reasonable inference that Defendant Chavez and Schwartz simply regurgitated the same false testimony that was sworn to in the probable cause affidavit or to which they had previously testified to in one or more examining trials, and that all video evidence that would have demonstrated the lack of probable cause to indict Plaintiffs was withheld from the Grand Jury deliberations.

148.     In fact, Plaintiffs allege that no <u>specific evidence</u> concerning the Plaintiffs herein was ever presented to the grand jury. No gang database evidence was presented that would identify Plaintiffs as members of a criminal street gang because no such evidence exists.

149.     Further evidence that the Grand Jury's deliberation was tainted is the fact that in all 106 indictments issued on November 10, 2015  the list of those killed includes an individual named William Anderson, who in fact, was not killed at Twin Peaks and is very much alive to this day. The Grand Jury was so misled by the evidence presented that it indicted 106 people, including Plaintiffs, with Mr. Anderson's death, despite Mr.

Anderson not being killed or injured in the Twin Peaks incident.

150.    During various examining trials, law enforcement witnesses, including Chavez and Schwartz, have continued to perpetuate the idea that motorcycle club affiliation, jacket and vest patches, and other lawful clothing is evidence of membership in a criminal street gang. It is a reasonable inference that this same misleading, false information was presented to the Grand Jury in order to obtain the indictment of Plaintiff.

151.    Not only was video evidence that would have clearly shown an absence of probable cause to indict Plaintiffs available, that same video evidence was being used by law enforcement immediately after the incident to determine whether to return motorcycles and vehicles that were initially seized by law enforcement.

152.    Additionally, each indictment separately accuses each Plaintiff of having "intentionally and knowingly caused the death" of one or more of a long list of individuals *and* of having "intentionally, knowingly, and recklessly caused bodily injury" to one or more of a long list of individuals.

153.    Given that Defendants have spent several years analyzing multiple terabytes of information, and have not unearthed *any* evidence to specifically link any individual Plaintiff herein to a murder or assault at Twin Peaks, no such evidence could possibly have been presented to the Grand Jury when Plaintiffs were indicted.

154.    Similarly, Defendants have not found, and therefore could not possibly have presented to the Grand Jury, *any* evidence that any of the Plaintiffs herein "agreed

with one or more persons"[6] to commit murder or assault.

155. No truly independent factfinder could possibly have indicted each Plaintiff without *any* such evidence—evidence that is *necessary to the elements of the crimes with which Plaintiffs were charged.* This illustrates how the Grand Jury was in no way an "independent intermediary" in this case, but rather relied completely on Reyna's and other Defendants' incomplete, false and misleading version of the events and how the law applied to them.

156. Finally, unlike a "typical" indictment in which a case is presented to a Grand Jury by prosecutors who had nothing to do with the original arrest, here, *the bad actors who caused the unlawful arrests were the exact same individuals who persuaded the Grand Jury to indict Plaintiffs.* This belies any notion that the Grand Jury was "independent," and instead allows an inference that the indictment was an intentional and direct continuation of the unlawful mass arrest.

157. In sum, the "evidence" presented to the Grand Jury was, as described in the preceding paragraphs, intentionally false, misleading, and incomplete in the most material ways. In other words, much less than all of the relevant facts were presented to the Grand Jury, and the Grand Jury's decision to indict was not "independent" in any imaginable meaning of the word. In fact, it amounted to nothing more than a rubber stamping of the absurd theory advanced by Defendants that has caused irreparable harm

---

[6] Tex. Pen. Code § 71.01(b) (Definition of "conspires to commit").

to Plaintiffs and many others, and has culminated in civil rights violations that are without precedent in this country.

**HOUSE OF CARDS COLLAPSES**

158.    As of the date of this filing, only one of the 192 criminal cases has been tried, and not a single person has been convicted.

159.    37 of the original 177 were never even presented to a grand jury.

160.    Over a period of several weeks, just shy of the three-year anniversary of the event, Defendant Reyna effectively folded his cards by dismissing 168 of the 192 people charged. Many of the remaining charges have been reduced to drastically lesser charges. The newly-elected McLennan County District Attorney Barry Johnson has been publicly skeptical of the validity of the remaining charges; more dismissals are expected in the coming months.

## VI. **FACTS PERTAINING TO PLAINTIFFS**

161.    John Wilson is a resident of McLennan County, Texas. Plaintiff John Wilson is a small business owner and owns and operates a motorcycle shop in Waco, Texas.

162.    Upon hearing gunfire, Plaintiff Wilson took cover.

163.    Plaintiff Wilson spent 28 days in jail.

164.    John Arnold is a resident of McLennan County, Texas.

165.    Upon hearing gunfire, Plaintiff Arnold took cover.

166.    Plaintiff Arnold spent 28 days in jail.

167.    James Brent Ensey is a resident of Stephens County, Texas. Plaintiff is married and has two children.

168.     Plaintiff Ensey was inside the Twin Peaks when he first heard gunfire, and he immediately took cover.

169.     Plaintiff Ensey spent 33 days in jail.

170.     Edgar Kelleher is a resident of Palo Pinto County, Texas. Plaintiff is married and a father of four. Mr. Kelleher is also a small business owner in the oil field service industry.

171.     Upon hearing gunshots, Plaintiff Kelleher took cover.

172.     Plaintiff Kelleher spent 16 days in jail.

173.     Brian Logan is a resident of Maryland. Plaintiff is an honorably discharged veteran of the Navy and a dedicated father.

174.     Upon hearing gunshots, Plaintiff Logan took cover.

175.     Plaintiff Logan spent 21 days in jail.

176.     Terry S. Martin is a resident of Lubbock County, Texas.

177.     Upon hearing gunshots, Plaintiff Martin took cover.

178.     Plaintiff Martin spent over thirty days in jail.

179.     Robert Robertson is a resident of Tarrant County, Texas. Plaintiff is married and has three children.

180.     Upon hearing gunshots, Plaintiff Robertson took cover.

181.     Plaintiff Robertson spent 30 days in jail.

182.     Jacob Wilson is a resident of McLennan County, Texas and the son of Plaintiff John Wilson. Jacob works for his dad at Legends Motorcycle in Waco, Texas and is also a father himself.

183.    Upon hearing gunshots, Plaintiff Jacob Wilson took cover.

184.    Plaintiff Jacob Wilson spent 37 days in jail.

185.    John Craft is a resident of Bell County, Texas.

186.    Upon hearing gunshots, Plaintiff Craft immediately took cover.

187.    Plaintiff John Craft spent over three weeks in jail.

188.    Daniel Johnson is a resident of McLennan County, Texas. Mr. Johnson lost his job as a truck driver as a result of his false arrest.

189.    Upon hearing gunfire, Plaintiff Johnson ran and took cover inside the restaurant.

190.    Plaintiff Johnson spent 30 days in jail.

191.    Jason Dillard is a resident of Smith County, Texas.

192.    Upon hearing gunfire, Plaintiff Dillard took to the ground and crawled away for cover.

193.    Plaintiff Dillard spent 30 days in jail.

194.    Ronald Atterbury is a resident of Coryell County, Texas.

195.    Upon hearing gunfire, Plaintiff Atterbury immediately took cover.

196.    Plaintiff Atterbury spent over three weeks in jail.

### Facts Common to Each Plaintiff

197.    On the date in question, Plaintiffs were not, nor have they ever been, members of a criminal street gang. Defendants were aware that Plaintiffs were not members of a criminal street gang because they had access to websites and state databases that proved that Plaintiffs were not in a criminal street gang.

198.    Each Plaintiff was at the Twin Peaks in Waco for the purpose of attending the COC meeting, and to socialize with friends from around the state.

199.    Each Plaintiff was engaged in **completely lawful conduct** at all times relevant to the Twin Peaks incident.

200.    Plaintiffs' attendance at the COC meeting on May 17, 2015, was lawful and did not violate any laws of Texas or the United States.

201.    All clothing worn by Plaintiffs on May 17, 2015, including jackets, vests, t-shirts, and patches, was completely lawful and did not violate any laws of Texas or the United States.

202.    No Plaintiff herein shot, struck, or threatened any person on May 17, 2015.

203.    No Plaintiff herein encouraged anyone to shoot, strike, or threaten any person on May 17, 2015.

204.    Each Plaintiff's actions upon hearing gun shots were consistent with what 99% of the population would do – they immediately took cover to avoid being struck.

205.    In summary, Plaintiffs had absolutely nothing to do with the tragic deaths and injuries that occurred on May 17, 2015, at Twin Peaks.

206.    The entire basis of Defendants' belief that probable cause existed to arrest and charge Plaintiffs comes down to their membership in a motorcycle club and their mere presence at the Twin Peaks restaurant on May 17, 2015.

207.    With respect to each Plaintiff herein, the affidavit on which probable cause to arrest was based is false in every material way.

208.     The probable cause affidavit signed by Manuel Chavez **fails to identify even one single fact specific to any individual Plaintiff that would reasonably constitute criminal conduct**.

209.     Each Plaintiff's cell phone has been examined by law enforcement and contains no evidence of any illegal plan or desire to engage in illegal conduct before, during, or after May 17, 2015.

210.     With respect to each Plaintiff herein, video evidence conclusively shows that he did not participate in, nor did he encourage anyone to participate in the violence.

211.     The video evidence shows each Plaintiff herein acting in a lawful manner prior to and during the violence.

212.     **Despite analysis of multiple terabytes of evidence including phone records, computer records, eyewitness accounts, jail phone calls, jail letters, multiple video accounts of the incident, and wiretap evidence, <u>Defendants have no evidence that any Plaintiff herein had any intention to commit a crime or encourage anyone to commit a crime at Twin Peaks on May 17, 2015.</u>**

213.     Despite the lack of any indicia to establish probable cause, each Plaintiff herein was arrested for Engaging in Organized Criminal Activity and their bonds were initially set at one million dollars ($1,000,000). Plaintiffs were only able to post bail after their bonds were substantially lowered.

## VII.    CAUSES OF ACTION

### 42 U.S.C. § 1983 – 4th Amendment Violation
### pursuant to *Malley v. Briggs*

214.    All preceding paragraphs are incorporated herein by reference.

215.    Plaintiffs had a clearly established Constitutional right to be free from unlawful arrest. As a direct result of Defendants' conduct, Plaintiffs were falsely arrested and charged with Engaging in Organized Criminal Activity, despite the absence of probable cause to establish that each had committed a crime. Defendants' conduct, as described above, deprived Plaintiffs of their right to be secure in their persons against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

216.    The Fourth Amendment of the U.S. Constitution states,

> "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, **and no warrants shall issue, but upon probable cause**, supported by oath or affirmation, and **particularly describing** the place to be searched, and the persons or things to be seized." (*Emphasis added.*)

As the Supreme Court of the United States has plainly stated, "**[w]here the standard is probable cause, a**... **seizure of a person must be supported by probable cause particularized with respect to that person**." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).[7]

---

[7] *See also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("...**the belief of guilt must be particularized with respect to the person to be searched or seized.**"); *Trapper v. North Carolina*, 451 U.S. 997, 1000 (1981); *Michigan v. Summers*, 452 U.S. 692, 695, n. 4 (1981); *U.S. v. Hearn*, 563 F.3d 95, 103 (5th Cir. 2009) (quoting *Ybarra*, 444 U.S. at 91); *U.S. v. Zavala*, 541 F.3d 562, 575 (5th Cir. 2008); *Williams v. Kaufman Co.*, 352 F.3d 994, 1003 (5th Cir. 2003) (quoting *Ybarra*, 444 U.S. at 91); *Merchant v. Bauer*, 677 F.3d 656, 666 (4th Cir. 2012) ("**The Supreme Court has emphasized that '[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.'**"); *Hawkins v. Mitchell, et al*, 983, 994 (7th Cir. 2014); *U.S. v. Ojeda-Ramos*, 455 F.3d 1178, 1181 (10th Cir. 2006) (quoting *Ybarra*, 444 U.S. at 91); *U.S. v. Guzman*, SA-13-CR-89-DAE (W.D. Tex. 2013); *Dinler v. City of New York*, 2012

---

217.    Plaintiffs plead that Defendants Stroman, Lanning, Reyna, Chavez, Rogers, Swanton, Schwartz, and Frost knowingly and intentionally, or with reckless disregard for the truth, caused a facially deficient, fill-in-the-name template affidavit, completely lacking in particularized facts against them to be presented to the Magistrate Judge for the purpose of obtaining an arrest warrant.

218.    Further, Defendants Chavez and Reyna are liable to Plaintiffs because they knowingly and intentionally, or with reckless disregard for the truth, presented or caused to be presented a facially deficient, fill-in-the-name template affidavit, completely lacking in particularized facts against Plaintiffs to the Magistrate Judge for the purpose of obtaining arrest warrants.

219.    A person acting under color of law is not entitled to qualified immunity when he submits a warrant application that is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. *Malley v. Briggs*, 475 U. S. 335, 345, 106 S. Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). No reasonable police officer or law enforcement actor could reasonably have believed the law was otherwise, or that the affidavit in question established probable cause against Plaintiffs.

220.    Because the template affidavits regarding Plaintiffs lack assertions of fact that, even if true, would establish probable cause, Defendants have each, individually and as a group, violated Plaintiffs' Fourth Amendment rights.

---

WL 4513352 *6 (S.D.N.Y 2012) ("**The Fourth Amendment does not recognize guilty by association**.").

221.    "The Fourth Amendment directs that 'no Warrants shall issue, but upon probable cause... and particularly describing the place to be searched, and the persons or things to be seized.' Thus, 'open-ended' or 'general' warrants are constitutionally prohibited." *Ybarra v. Illinois*, 444 U.S. 85, 92 n. 4 (1979). It was well settled law in this country prior to May 17, 2015 that use of a general warrant application was prohibited. Defendants' actions effectively constitute the use of a general warrant prohibited by the Constitution and decades of United States Supreme Court case law.

222.    As set forth in *Malley v. Briggs*, and its progeny, Plaintiffs' Fourth Amendment rights were violated when a probable cause affidavit was presented for the purpose of obtaining an arrest warrant that was so lacking in indicia of probable cause as to render official belief in existence of probable cause "unreasonable."

223.    The affidavit, attached as Exhibit 1 to this Complaint, contains identical language to the affidavits used to establish probable cause against Plaintiffs, and is incorporated herein by reference. The plain language of the affidavit indicates that it does not contain a single particularized assertion of fact against any Plaintiff that would establish a reasonable belief that any Plaintiff has committed a criminal offense.

224.    As a direct result of Defendants' conduct and actions, Plaintiffs were deprived of their constitutional rights all to their damages.

**42 U.S.C. § 1983 – 4th Amendment Violation**
**Pursuant to *Franks v. Delaware***

225.     All preceding paragraphs are incorporated herein by reference.

226.     In the alternative, Plaintiffs plead civil liability against Defendants based on a "*Franks*" violation. *See Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); *see also Hale v. Fish*, 899 F.2d 390, 400 n.3 (5th Cir. 1990). Defendants Stroman, Lanning, Reyna, Chavez, Rogers, Schwartz, and Frost knowingly and intentionally, or with reckless disregard for the truth, caused an affidavit against each Plaintiff to be presented to the Magistrate Judge that each knew to be materially false and misleading.

227.     Further, Defendant Chavez is liable to Plaintiffs because he knowingly and intentionally, or with reckless disregard for the truth, swore to probable cause affidavits against Plaintiffs that he either knew to be materially false and misleading, or at a minimum, did not know them to be true, and presented them to the Magistrate Judge.

228.     Defendant Chavez swore under oath that he had personal knowledge of the information set forth in the probable cause affidavits. He did not. In fact, he did not possess any knowledge of any facts pertaining to Plaintiffs.

229.     By indicating that Plaintiffs were members of criminal street gangs, when in fact they were not, and when there was no such evidence of gang membership, Defendants Reyna, Rogers, Swanton, Schwartz, and Frost caused a warrant to be issued that would otherwise have lacked any factual basis for probable cause.

230.     The affidavits falsely state that each Plaintiff is "a member of a criminal street gang." That statement is categorically *false*. It is an indisputable fact that Defendants

did not possess any reliable particularized information to indicate that Plaintiffs themselves were members of a criminal street gang on or before the date such fact was sworn to by Defendant Chavez. Plaintiffs were not, and never have been, members of a criminal street gang.

231.    Further, the probable cause affidavits state, "[a]fter the altercation, the subject was apprehended at the scene, while wearing common identifying distinctive signs or symbols **or** had an identifiable leadership or continuously **or regularly associate in the commission of criminal activities**." These statements are false and misleading and were known to be false and misleading by Defendants at the time Chavez swore to such.

232.    Defendants offer no specific facts of any nature that Plaintiffs regularly associated in the commission of criminal activities.[8]  In fact, the probable cause affidavits misstate an essential element of the definition of "criminal street gang".  TEXAS PENAL CODE § 71.01(d) states that "'Criminal street gang' means three or more persons having a common identifying sign or symbol or an identifiable leadership **who continuously or regularly associate in the commission of criminal activities**."  There is no "or" before "who continuously or regularly . . ." The last phrase MUST be proven as an essential element of the definition.  The omission of this essential element, or language suggesting that it is not an essential element, is misleading on its face.

233.    Information omitted from the probable cause affidavit by Defendants would have negated probable cause. Despite a duty to include information that weighs

---

[8] Plaintiffs categorically deny that they continuously or regularly associated in the commission of criminal activities.

against probable cause, Defendants knowingly and intentionally, or with reckless disregard for the truth, failed to reference the complete lack of any particularized evidence connecting Plaintiffs to the deaths or injuries that occurred at Twin Peaks. Further, the affidavit fails to reference the indisputable video evidence that is completely contrary to the notion that Plaintiffs planned, participated, or engaged in criminal conduct.

234. Since at least *Franks v. Delaware,* and as reiterated by the Fifth Circuit in *Hale v. Fish*, police officers and law enforcement officials have known that willful, intentional, and/or reckless misrepresentations made for the purpose of establishing probable cause violate an individual's Fourth Amendment rights. Put otherwise, no reasonable officer could possibly conclude that he was authorized to include known false statements and/or fail to include exculpatory information in an affidavit. As a direct result of Defendants' conduct and actions, Plaintiffs were wrongfully arrested even though probable cause did not exist.

## 42 U.S.C. § 1983 – 14th Amendment Violation

235. All preceding paragraphs are incorporated herein by reference.

236. If it is determined that a Fourth Amendment violation is not sustainable, Plaintiffs alternatively assert a violation of their Due Process rights under the Fourteenth Amendment to be free from unlawful arrest as a result of false and misleading statements that were knowingly, or with reckless disregard, included in the probable cause affidavits. The Due Process Clause of the Fourteenth Amendment was intended to

prevent government from abusing its power, or employing it as an instrument of oppression.

237.     Specifically, Plaintiffs have rights guaranteed by the Fourteenth Amendment not to have law enforcement deliberately fabricate evidence, including the insertion of facts in affidavits and arrest documents (and provide testimony based on those "facts" to secure an indictment), that Defendants know to be false.

238.     Here, Defendants knew there was no basis for the claims that Plaintiffs were members of a criminal street gang who committed or conspired to commit murder, capital murder, or aggravated assault. By inserting such claims in the probable cause affidavit and other official documents related to Plaintiffs' arrests, Defendants violated Plaintiffs' Fourteenth Amendment rights. This is conduct sufficient to shock the conscience for substantive due process purposes.

239.     The doctrine set forth by the Fifth Circuit in *Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015)[9] is hereby invoked and pled.

240.     Plaintiffs alternatively assert a violation of their fundamental rights under the Fourteenth Amendment.

241.     As a result of their arrest and the charges that Defendants maintained against them long after they were aware that they lacked probable cause to arrest in the

_____

[9] In 2016, the Supreme Court vacated the 2015 *Cole* opinion and remanded to the Fifth Circuit for further consideration. *Hunter v. Cole*, 137 S.Ct. 497 (Mem.) (Nov. 28, 2016). Upon remand, a panel of the Fifth Circuit re-examined portions of the qualified immunity analysis for the Fourth Amendment claim, and reinstated the 2015 opinion "as concerns all other parts of the appeal…" *Cole*, 905 F.3d at 342. The rule that a due process claim maybe brought when police fabricate evidence and use it to falsely charge a person continues to apply in full force.

first place, Plaintiffs were deprived of their ability to freely associate with other motorcycle enthusiasts regardless of whether there was any demonstrated connection to criminal activity.

242. As a result of their arrest and the charges that Defendants maintained against them long after they were aware that they lacked probable cause to arrest in the first place, Plaintiffs were deprived of their ability to travel outside of Texas.

243. As a result of their arrest and the charges that Defendants maintained against them long after they were aware that they lacked probable cause to arrest in the first place, as well as ongoing, disparaging statements made through mass media, Defendants inflicted publicity on Plaintiffs which placed them in a false light in the public eye, causing Plaintiffs to suffer reputational harm that impinged upon their fundamental right to personal liberty.

244. As a result of their arrest and the charges that Defendants maintained against them long after they were aware that they lacked probable cause to arrest in the first place, Plaintiffs were deprived of their right to privacy, specifically the intrusion upon their seclusion or solitude and private affairs.

245. No reasonable police officer or law enforcement actor could reasonably have believed the law was otherwise, or that such conduct was not a violation of Plaintiffs' rights.

## 42 U.S.C. § 1983 – Conspiracy

246.     All preceding paragraphs are incorporated herein by reference.

247.     In the hours and days immediately following the incident, Defendants Stroman, Chavez, Reyna, Lanning, Rogers, Swanton, Schwartz, and Frost entered into a conspiracy to deprive Plaintiffs of their right to be free from unlawful seizure and incarceration in violation of their Fourth and/or Fourteenth Amendment rights. Defendants acted in concert either to orchestrate or to carry out the illegal seizure and cause the illegal arrest and incarceration described in this Complaint when they knew there was no probable cause to arrest them or to charge them with the offenses of Engaging in Organized Criminal Activity. Defendants are liable to Plaintiffs for their violations of the Fourth and/or Fourteenth Amendments under 42 U.S.C. § 1983.

248.     As described above, Defendants Stroman, Chavez, Reyna, Lanning, Rogers, Swanton, Schwartz, and Frost caused a warrant to be issued against Plaintiffs based on false or deficient probable cause affidavits that Defendants knew to be false or deficient.

249.     Defendants were aware that Chavez was swearing to false statements for the purpose of obtaining an arrest warrant yet took no action to stop him.  In fact, as described above, they encouraged Chavez despite knowledge of video evidence that directly contradicted any reasonable belief that Plaintiffs had committed a crime. Defendants Reyna, Stroman, Lanning, Rogers, Swanton, Schwartz, and Frost's encouragement of Chavez is evident in that Defendants met together on May 17 and May 18 to discuss this very issue and records indicate full knowledge and acquiescence by all Defendants. Public statements by Stroman, Reyna, and Swanton further confirm

Defendants' awareness of the actions taken to cause Plaintiffs to be arrested without probable cause.

250.    The conspiracy involved state action, as Defendants Stroman, Chavez, Reyna, Lanning, Rogers, Swanton, Schwartz, and Frost acted under color of the statutes, customs, ordinances, and usage of the State of Texas.

251.    As a direct result of Defendants' illegal conduct, Plaintiffs were deprived of their constitutional rights, all to their damages.

**Defendant Reyna is not entitled to immunity.**

252.    Defendant Reyna investigated the scene within hours of the incident, took photographs of the scene, reviewed information as it became known, and in all respects inserted himself in the role of an investigator/detective.

253.    Defendant Reyna's conduct was not "intimately associated with the judicial process," but rather he involved himself in the **investigative phase** of the case **prior to a determination of probable cause**, and thus, is not entitled to absolute prosecutorial immunity.

254.    In fact, law enforcement witnesses and Reyna himself have testified under oath that Reyna established the criteria that provided a basis for probable cause.[10]

---

[10] Abel Reyna testimony from Motion to Disqualify, August 8, 2016, page 151:
Q: And there has been testimony and there have been police reports prepared that imply that you or your office set the criteria of who to arrest. Is that a fair statement?
A: The criteria?
Q: Yes.
A: Yes.

255.     To the extent Reyna provided legal advice, it was provided to police and other law enforcement officials **during the investigative phase**. Defendant Reyna involved himself in the decision to arrest when he called the meeting described above and changed the course of earlier decisions to release most of those detained, including Plaintiffs.

256.     In fact, Chief Stroman and acting Chief Lanning ultimately acquiesced to Reyna's decision to arrest each individual who met certain established criteria related to club affiliation and/or clothing, patches, bumper stickers, etc. that in their minds suggested "support" for either the Bandidos or the Cossacks.

## 42 U.S.C. § 1983 – Municipal Liability

257.     All preceding paragraphs are incorporated herein by reference.

258.     At all relevant times, Defendant Brent Stroman and/or Defendant Lanning, as the acting Chief on the day in question, was the policymaker, or the *de facto* policymaker, for the City of Waco with respect to all law enforcement matters relating to the Waco Police Department.

259.     At all relevant times, Defendant Abel Reyna, as the District Attorney for McLennan County, Texas, was the policymaker, or the *de facto* policymaker, for McLennan County with respect to all law enforcement matters relating to the McLennan County District Attorney's Office.

260.     Defendants Stroman, Lanning, and/or Reyna ordered the arrest of Plaintiffs, despite their knowledge that there was no probable cause to charge them with <u>any</u> offense, and/or deliberate indifference to the absence of such probable cause.

261.    As such, the City of Waco and McLennan County are liable for Plaintiffs' constitutional wrongs suffered as the individual Defendants are the policymakers for their respective governmental employers.

262.    Defendant Stroman had final policymaking authority from the City of Waco concerning the unconstitutional acts of Defendants Chavez, Rogers, and Swanton and ratified those acts, that is, Defendant Stroman knew of and specifically made a deliberate choice to approve Defendants Chavez, Rogers, and Swanton's unconstitutional acts and the basis for them.

263.    Alternatively, Defendant Lanning had final policymaking authority from the City of Waco concerning the unconstitutional acts of Defendants Chavez, Rogers, and Swanton and ratified those acts, that is, Defendant Lanning knew of and specifically made a deliberate choice to approve Defendants Chavez, Rogers, and Swanton's unconstitutional acts and the basis for them.

264.    Defendant Reyna had final policymaking authority from McLennan County concerning the unconstitutional acts of those working for him and at his direction, and ratified those acts, that is, Defendant Reyna knew of and specifically made a deliberate choice to approve the unconstitutional acts of those working for him and at his direction, and the basis for those acts.

265.    Furthermore, despite all the obvious wrongs, no City of Waco or McLennan County employee has received any discipline or consequence due to their actions, thereby ratifying their actions as policy of the City of Waco and McLennan County.

266.    In the event the City Council is determined to be the final policy maker for

the City of Waco, the Waco City Council was aware that Plaintiffs were being detained without probable cause, and yet refused to release Plaintiffs from custody, conduct any investigation, and was deliberately indifferent to Plaintiffs' constitutional rights.

267. Alternatively, in the event that either the McLennan County Commissioners' Court or Sheriff's Department is determined to be the final policymaker for McLennan County, both the McLennan County Commissioner's Court and the McLennan County Sheriff were aware that Plaintiffs were being detained without probable cause, and yet refused to release Plaintiffs from custody, conduct any investigation, and were deliberately indifferent to Plaintiffs' constitutional rights.

268. The events of May 17, 2015 garnered national media attention and pervasive attention in local media that has continued to this day. The Waco City Council, the McLennan County Commissioners' Court, and the McLennan County Sheriff's Department were all aware of the events that transpired and the serious allegations that hundreds of individuals had been arrested and were being detained despite a total lack of probable cause.

269. In addition to their knowledge from media coverage, they were kept apprised of the ongoing circumstances surrounding the event on a regular basis.

## VIII. DAMAGES

270. As a direct and proximate result of the acts and omissions outlined above, each Plaintiff has been severely damaged. Each Defendant, acting individually, or in concert with the other Defendants, has caused each Plaintiff to suffer the damages described below.

271.    Each Plaintiff seeks compensatory damages in an amount deemed sufficient by the trier of fact to compensate them for their damages, which includes past and future mental anguish, past and future pain and suffering, past and future damage to their reputations, and past and future lost wages and lost earning capacities.

272.    Each Plaintiff also seeks damages as a result of Defendants' actions and conduct that have impinged on rights guaranteed by the First Amendment, such as Plaintiffs' right to free speech, and to association. Conditions placed on Plaintiffs' bonds have deprived Plaintiffs of rights guaranteed by the Constitution. It was entirely foreseeable to Defendants that falsely arresting and charging Plaintiffs with a felony criminal offense for which probable cause was lacking would lead to these constitutional deprivations and damages.

273.    Each Plaintiff also seeks damages for the costs they incurred in having to post bail and defend against the false criminal charges filed against them.  Those costs include the money they paid for legal representation.

274.    Each Plaintiff also seeks exemplary damages against each individual Defendant.

275.    Each Plaintiff has retained the services of the undersigned counsel, and claim entitlement to an award of reasonable and necessary attorney's fees under 42 U.S.C. § 1983 and 1988.

## IX. <u>JURY DEMAND</u>

276.    Plaintiffs respectfully request a trial by jury.

# X.  PRAYER FOR RELIEF

For these reasons, each Plaintiff seeks a judgment against each Defendant for:

a.  compensatory and actual damages in an amount deemed sufficient by the trier of fact;

b.  exemplary damages;

c.  attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988;

d.  costs of court; and

e.  interest allowed by law for prejudgment or post-judgment interest.

Respectfully submitted,

By:  /s/ *Don Tittle*

Don Tittle
State Bar No. 20080200
don@dontittlelaw.com

LAW OFFICES OF DON TITTLE, PLLC
6301 Gaston Avenue, Suite 440
Dallas, Texas  75214
214/522-8400
214/389-1002 – Fax
*LEAD COUNSEL FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February, 2019, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court, and that a true and correct copy of the foregoing has been served upon the following counsel of record, by electronic service via the Court's CM/ECF system:

Charles D. Olson
Mike Dixon
HALEY & OLSON, P.C.
510 N. Valley Mills Dr., Ste. 600
Waco, Texas 76710
972/205-2389
*Attorneys for the City of Waco, Stroman, Chavez, Lanning, Rogers, and Swanton*

Thomas P. Brandt
Stephen D. Henninger
FANNING, HARPER, MARTINSON
  BRANDT & KUTCHIN, P.C.
4849 Greenville Ave., Ste. 1300
Dallas, Texas 75206
*Attorneys for McLennan County and Abelino Reyna*

Harold Liller
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
*Attorney for Defendants Schwartz and Frost*

   /s/ Don Tittle              
Don Tittle

| THE STATE OF TEXAS | § | DOCKET # _____ |
| --- | --- | --- |
| | § | |
| COUNTY OF MCLENNAN | § | COURT: JP COURT PRECINCT 1 PLACE 2 |

## COMPLAINT
### {Articles 15.04 & 15.05, Texas Code of Criminal Procedure}

BEFORE ME, THE UNDERSIGNED AUTHORITY, PERSONALLY APPEARED THE AFFIANT HEREIN, A PEACE OFFICER UNDER THE LAWS OF TEXAS, WHO, BEING DULY SWORN, ON OATH MADE THE FOLLOWING STATEMENTS AND ACCUSATIONS:

My name is MANUEL CHAVEZ and I am commissioned as a peace officer with the City of Waco by The State of Texas. I hereby state upon my oath that I have reason to believe and do believe that heretofore, and before the making and filing of this Complaint, that on or about May 17, 2015, in McLennan County, Texas, the said _____ did then and there, as a member of a criminal street gang, commit or conspire to commit murder, capital murder, or aggravated assault, against the laws of the State.

My probable cause for said belief and accusation is as follows:

Three or more members and associates of the Cossacks Motorcycle Club (Cossacks) were in the parking lot of the Twin Peaks restaurant in Waco, McLennan County Texas. Three or more members and associates of the Bandidos Motorcycle Club (Bandidos) arrived in the parking lot of the Twin Peaks restaurant and engaged in an altercation with the members and associates of the Cossacks. During the course of the altercation, members and associates of the Cossacks and Bandidos brandished and used firearms, knives or other unknown edged weapons, batons, clubs, brass knuckles, and other weapons. The weapons were used to threaten and/or assault the opposing factions. Cossacks and Bandidos discharged firearms at one another. Members of the Waco Police Department attempted to stop the altercation and were fired upon by Bandidos and/or Cossacks. Waco Police Officers returned fire, striking multiple gang members. During the exchange of gunfire, multiple persons where shot. Nine people died as a result of the shooting between the members of the biker gangs. Multiple other people were injured as a result of the altercation. The members and associates of the Cossacks and Bandidos were wearing common identifying distinctive signs or symbols and/or had an identifiable leadership and/or continuously or regularly associate in the commission of criminal activities. The Texas Department of Public Safety maintains a database containing information identifying the Cossacks and their associates as a criminal street gang and the Bandidos and their associates as a criminal street gang.



After the altercation, the subject was apprehended at the scene, while wearing common identifying distinctive signs or symbols or had an identifiable leadership or continuously or regularly associate in the commission of criminal activities.

After the altercation, firearms, knives or other unknown edged weapons, batons, clubs, brass knuckles, and other weapons were recovered from members and associates of both criminal street gangs.

Multiple motorcycles with common identifying signs or symbols of the Cossacks and Bandidos and their associates were recovered at the scene. Additional weapons including: firearms, ammunition, knives, brass knuckles, and other weapons were found on the motorcycles.

_Mel Chg 238_
Complainant

SWORN TO AND SUBSCRIBED BEFORE ME BY SAID AFFIANT/COMPLAINANT ON THIS THE _18th_ DAY OF _may_, _2015_.

_R. H. DeLeon_
JUSTICE OF THE PEACE
MCLENNAN COUNTY, TEXAS